[No. C029236. Third Dist. Aug. 25, 2000.]

FRIENDS OF DAVIS, Plaintiff and Appellant, v.
CITY OF DAVIS, Defendant and Respondent;
FULCRUM DAVIS, Real Party in Interest and Respondent.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, the opinion should be published with the exception of parts II, IV and V.

**COUNSEL**

Law Offices of John C. Gabrielli and John C. Gabrielli for Plaintiff and Appellant.

McDonough, Holland & Allen, Harriet A. Steiner and Douglas A. Potts for Defendant and Respondent.

Remy, Thomas & Moose, Whitman F. Manley and Kathrine C. Pittard for Real Party in Interest and Respondent.

**OPINION**

**SCOTLAND, P. J.**—Following a lengthy joint planning process between the University of California, Davis (the University) and the defendant City of Davis (the City), the University issued a request for bids for a private concern to assume responsibility for commercial development of a small parcel of real property contiguous to the City's downtown area. Real party in interest Fulcrum Davis, a business entity, was the successful applicant and obtained an option to purchase the property. At that point in time, the only discretionary approval which remained was site plan and architectural approval pursuant to the City's design review ordinance. (Davis City Code, § 29-231 et seq.) When it was learned that Fulcrum Davis was negotiating with the Borders bookstore chain to open a bookstore in the proposed development, a number of persons objected. Taking the position that its design review ordinance does not encompass tenant approval, the City approved the design review application.

After unsuccessfully seeking relief in the trial court, plaintiff Friends of Davis (plaintiff) appeals, contending: (1) the City's interpretation of its design review ordinance is incorrect and unconstitutional; (2) the City misstated the law and engaged in bad faith conduct in order to curtail environmental review under the California Environmental Quality Act

(CEQA) (see Pub. Resources Code, § 21000 et seq.); (3) the City failed to complete a threshold analysis, and such an analysis would compel further review under CEQA; (4) other CEQA violations require setting aside approval under the design review ordinance; and (5) the City's interpretation of the design review ordinance and approval of the project are inconsistent with its general and specific plans. We shall reject these contentions and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

This litigation concerns a parcel of property of approximately three and one-half acres, located immediately adjacent to downtown Davis, which is regarded by the City as its "core area." The parcel originally was part of a larger parcel referred to as Aggie Village or the Aggie Village Project. Aggie Village had been owned by the University. In the course of events, part of Aggie Village was developed for residential use, part of it was maintained as open space, and Fulcrum Davis acquired an option to purchase the portion involved here for the purpose of constructing improvements to house retail businesses.

In 1987, when the City adopted its general plan, Aggie Village was outside the city limits. However, it was included in the general plan because it bore a relationship to city planning. The general plan called for annexation and use of the Aggie Village property for the purposes of a shopping center and conference hotel. At that time, it was anticipated the use of the Aggie Village property would include, on about 10 acres, a 150-room conference hotel and up to 100,000 square feet of retail space. Adoption of the general plan was preceded by preparation and certification of an environmental impact report (EIR).

In 1993, the City revised the transportation and circulation element of its general plan, and adopted a mitigation monitoring plan. These actions were preceded by preparation and certification of an EIR.

In 1994, the University adopted a long-range development plan. Adoption of the plan was preceded by the preparation and certification of an EIR. The plan designated part of Aggie Village for residential development and another part for commercial development compatible with neighboring uses on campus and in the City.

In 1995, with respect to the specific project for development of Aggie Village, the University conducted a tiered initial study relying on the program EIR certified in connection with the long-range development plan. At

that time, the proposed Aggie Village Project included three elements: (1) residential development of 4.5 acres; (2) open space elements; and (3) commercial development of 3.5 acres consisting of up to 50,000 square feet of office and retail space and a parking lot with 180 spaces. As the result of the tiered initial study, the University adopted a CEQA negative declaration.

In 1995, the University applied to the City for prezoning of Aggie Village.[1] The University requested that the portion of the property slated for commercial use be prezoned as central commercial, which would permit retail and office use. Following public hearings, the City amended its general plan to reflect the development of Aggie Village as residential/retail rather than as a conference hotel and shopping center, and to anticipate 30,000 to 50,000 square feet of new retail use rather than 100,000 square feet. The commercial portion of the project was prezoned to central commercial. An application for annexation was filed with the Local Agency Formation Commission. In taking these actions, the City treated the University as lead agency for purposes of CEQA. The City relied upon the University's long-range development plan EIR and Aggie Village negative declaration. The Local Agency Formation Commission subsequently approved annexation, and annexation became effective on February 16, 1996.

In 1996, the City adopted its Gateway/Olive Drive Specific Plan. That plan encompassed Aggie Village but did not modify the previously approved zoning and general plan provisions applicable to Aggie Village. Adoption of the plan was preceded by preparation and certification of an EIR. The EIR noted the Aggie Village Project had been subjected to CEQA review by the University, and included it in the Gateway/Olive Drive review for cumulative impact and environmental setting purposes only.

In 1996, the City also adopted its Core Area Specific Plan. That plan reflects the designation of the subject property for use as core retail with offices. Adoption of the plan was preceded by preparation and certification of an EIR.

The subject property is located at the intersection of Richards Boulevard and First Street. Richards Boulevard traverses the area between Interstate 80 and First Street and, in that distance, includes a two-lane railroad under-crossing. The City's general plan included a proposal for widening Richards Boulevard and the undercrossing to four lanes. In 1996, the City prepared

---

[1]Pursuant to Government Code section 65859, a city may prezone unincorporated property adjoining the city for the purpose of determining the zoning that will apply upon annexation. Prezoning is accomplished through the same procedures applicable to zoning and becomes effective when annexation becomes effective.

and certified an EIR with respect to widening Richards Boulevard. Three alternatives, including an alternative incorporating transportation demand management (TDM) measures, were analyzed in the EIR, at a level of detail given that of the proposed project. The EIR states that, while this was not a CEQA requirement, it was determined to be necessary by the city council.

The city council approved the Richards Boulevard widening project. However, the voters then rejected it by referendum. Thereafter, the city council recertified the EIR, disapproved the project to widen Richards Boulevard, adopted the TDM alternative, and amended the general plan to delete widening of the road as a policy.

As a result of these actions, which are final and beyond judicial review at this time, the subject property was annexed to the City, zoned as central commercial, and slated in the City's general and applicable specific plans for commercial use as retail and/or office space.

Fulcrum Davis eventually acquired an option to purchase the commercial property from the University, and began negotiating a lease with Borders to locate a bookstore in the proposed project. This generated public controversy and debate. The city council received a petition opposing the location of a Borders bookstore in Davis. The city council addressed the issue on two occasions, but declined to take action, such as imposing a development moratorium, on the property.

Cities are required to have a comprehensive, long-term general plan for the physical development of the city. (Gov. Code, § 65300.) A city may adopt specific plans for the systematic implementation of the general plan for all or part of the area covered by the general plan. (Gov. Code, §§ 65450, 65453.) The development of particular parcels of property is governed by a city's zoning laws, ordinances, rules, and regulations. (Gov. Code, §§ 65800, 65804.) Generally the uses permitted on particular properties are governed by the zoning applicable to the properties. However, where there is the possibility that a permitted use may be incompatible in some respects with applicable zoning, the city may require that a special or conditional use permit be acquired. (*County of Imperial v. McDougal* (1977) 19 Cal.3d 505, 510 [138 Cal.Rptr. 472, 564 P.2d 14].) Where a use is consistent with applicable zoning, and a conditional use permit is either not required or has been obtained, then the next step generally would be to obtain a building permit, the issuance of which is presumptively a ministerial rather than discretionary act. (*Day v. City of Glendale* (1975) 51 Cal.App.3d

817, 820-821 [124 Cal.Rptr. 569]; see Cal. Code Regs., tit. 14, § 15268 (Guidelines).)[2]

In Davis, the City imposes one additional requirement upon landowners in the form of site plan and architectural approval. (Davis City Code, art. XXVIII, commencing with § 29-231.)[3] In order to better define the criteria for review and approval, the City's design review commission adopted, and the city council approved, a document entitled the City of Davis Design Review Commission Architectural and Landscape Architectural Standards. This document explains that anyone seeking a permit for the construction of a building with three or more living units, duplexes when required by the planning commission, single-family attached units, and commercial and industrial developments and additions, must submit to design review. The review encompasses fairly detailed review of the exterior design and appearance of the proposed project.

In March 1997, Fulcrum Davis submitted an application for design review. The project, now referred to as Davis Commons, anticipated approximately 45,000 to 47,700 square feet of retail development to house a number of retail stores and restaurants in a cluster of separate buildings with an outdoor park and customer seating area. After review, the City's planning and building department issued a notice of an intent to approve the design review application.

The Borders bookstore issue was raised during the design review process. The City's planning and building department staff took the position that the purpose and scope of design review is not to establish permitted land uses or development standards, and that the design review process does not differentiate between one retail tenant and another.

The decision to approve the design review application was appealed to the City's planning commission, which rejected the challenge and voted to approve the design review application. This decision was appealed to the city council. Following a hearing, the city council denied the appeal. On petition for a writ of mandate, the trial court denied relief.

---

[2]CEQA requires the Office of Planning and Research to prepare, develop, and periodically review and amend guidelines for the implementation of CEQA by public agencies. (Pub. Resources Code, §§ 21083, 21087.) The California Supreme Court has not yet determined whether these Guidelines are regulatory mandates or merely aids to interpretation, but has declared that they should be given great weight by the courts unless clearly unauthorized or erroneous under CEQA. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123, fn. 4 [26 Cal.Rptr.2d 231, 864 P.2d 502].) We will follow the Supreme Court's lead in employing shorthand references to "Guidelines" rather than giving the full citation to the California Code of Regulations.

[3]The full text of the City's design review ordinance is attached as an appendix.

## DISCUSSION

### I

 As we have noted, when some citizens asked the City to use the design review ordinance to exclude Borders from locating in the City, the City took the position that the design review ordinance does not extend to tenant approval. Plaintiff contends this construction of the ordinance is incorrect, unconstitutional, and constitutes a clear misstatement of law. We disagree.

In asserting that the design review ordinance must be construed to include tenant approval, plaintiff paraphrases the introductory declaration of purpose in the ordinance.[4] According to plaintiff, that broad and general declaration of purpose, together with equally broad declarations in the City's general and specific plans, "require and allow the exercise of extremely broad implementation discretion."

 A city's power to enact zoning regulation derives from the police power and, as such, zoning regulations must be reasonably necessary and reasonably related to the health, safety, morals, or general welfare of the community. (*In re White* (1925) 195 Cal. 516, 520 [234 P. 396].) To be valid, zoning regulations must be expressly or impliedly based upon a finding by the governing body of the municipality that such regulations are necessary for the general welfare of the community. (*Ibid.*) The broad declaration of purpose in section 29-232 of the Davis City Code is nothing more than a declaration that a design review process is necessary and will serve the purposes of the City's land use policies.

While a zoning regulation must serve the general welfare, that, in itself, is not a sufficiently precise standard for the content of a zoning regulation. (See *Associated Home Builders etc., Inc v. City of Livermore* (1976) 18 Cal.3d 582, 598 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; *Briggs v. City of Rolling Hills Estates* (1995) 40 Cal.App.4th 637, 642 [47 Cal.Rptr.2d 29].) A zoning ordinance must provide at least some criteria to govern its application. (*Ibid.*) The City's design review ordinance does so. Davis

---

[4]The declaration of purpose provides: "The purpose of the design review process is comprehensive site plan and architectural review so as to determine compliance with this article and to promote the orderly and harmonious growth of the city and the stability of land values and investments and the general welfare; *and to help prevent the impairment or depreciation of land values and the development by the erection of structures, additions or alterations thereto without proper attention to siting, or of unsightly, undesirable or obnoxious appearance; and to prepare for* and help to prevent problems arising affecting the community due to the nature of existing and planned uses of land and structures, such as traffic, public, safety, *public facilities, utilities and services*, among others." (Davis City Code, § 29-232.) The italicized portions are omitted by plaintiff.

City Code section 29-232.1, labeled "Findings," refers entirely to the adverse effects of "poor or inappropriate exterior design of improvements." Davis City Code sections 29-233 and 29-233.1 establish the functions of design review and the principles to be followed. Those sections provide for review of the siting, exterior appearance, and landscaping of proposed projects, but do not arguably provide for tenant approval or tenant-specific review of the previously approved use of the proposed project.

■ In the interpretation of written laws, the intent of the legislative body is not gleaned solely from introductory statements such as a preamble, but is gleaned from the law as a whole, which includes particular directives. (See *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1118 [81 Cal.Rptr.2d 471, 969 P.2d 564].) As a general rule, known as the canon of *ejusdem generis*, the enumeration of specific items or factors will be controlling over general statements placed before or after the list of specific items or factors. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1160-1161 & fn. 7 [278 Cal.Rptr. 614, 805 P.2d 873].) In other words, "the general term or category is 'restricted to those things that are similar to those which are enumerated specifically.' " (*Id.* at p. 1160, fn. 7.) For example, in determining the scope of the Unruh Civil Rights Act, the Supreme Court said: "The Legislature's decision to enumerate personal characteristics, while conspicuously omitting financial or economic ones, strongly suggests a limitation on the scope of the Unruh Act." (*Id.* at p. 1161.)

■ Application of the *ejusdem generis* principle is particularly appropriate here. While a city has broad authority over the regulation of land use within its territory, that authority is not unlimited. Where certain uses are permitted, a city cannot arbitrarily exclude others who would employ a similar use. (*Roman Cath. etc. Corp. v. City of Piedmont* (1955) 45 Cal.2d 325, 332-333 [289 P.2d 438].) Zoning and building laws "cannot be used unqualifiedly to restrict competition" (*McDonald's Systems of California, Inc. v. Board of Permit Appeals* (1975) 44 Cal.App.3d 525, 548 [119 Cal.Rptr. 26]), or simply to shield existing businesses from competition (see *LaFranchi v. City of Santa Rosa* (1937) 8 Cal.2d 331, 338 [65 P.2d 1301, 110 A.L.R. 639]; *Pacific P. Assn. v. Huntington Beach* (1925) 196 Cal. 211, 216 [237 P. 538, 40 A.L.R. 782]). While valid zoning regulations may affect competition and have other economic effects, a city does not have carte blanche to exclude a retail merchant that it, or some of its residents, do not like. (See *Ross v. City of Yorba Linda* (1991) 1 Cal.App.4th 954, 964-968 [2 Cal.Rptr.2d 638].) The broad and standardless construction of the City's design review ordinance urged by plaintiff would confer on the City's planning department virtually unrestrained power to decide who may and who may not do business in the City.

In this respect, the general statement of purpose in Davis City Code section 29-232 is, in itself, too imprecise and standardless to constitute a valid delegation of authority to the City's planning department. (See *People v. Binzley* (1956) 146 Cal.App.2d Supp. 889, 890 [303 P.2d 903].) In *Associated Home Builders etc., Inc. v. City of Livermore, supra,* 18 Cal.3d at page 598, the Supreme Court, in order to uphold the validity of an otherwise imprecise ordinance, incorporated specific guidelines from a related but separate board resolution. Here, we need not search for a sufficiently specific standard because the City has itself provided the standard in the specific provisions of the design review ordinance.

The City properly concluded that its design review ordinance does not encompass tenant approval.

Plaintiff contends the City's construction of its ordinance is unconstitutional. In this argument, plaintiff cites article XI, section 7, of our state Constitution, which gives cities the power to make and enforce local ordinances and regulations not in conflict with general laws. Plaintiff points out that CEQA is a general law and that the Legislature intended CEQA to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of its statutory language. (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)[5] It follows, according to plaintiff, that the City's design review ordinance must be construed to allow tenant-specific review of previously approved uses.

We reject this argument. In the Government Code, the Legislature has given cities and counties the authority to enact zoning ordinances and regulations. (Gov. Code, §§ 65800, 65850.) In doing so, the Legislature expressed an intention "to provide only a minimum of limitation in order that counties and cities may exercise the maximum degree of control over local zoning matters." (Gov. Code, § 65800.) A city is not, pursuant to general law, required to have a design review ordinance. Accordingly, where, as here, a city chooses to impose such an additional level of review, it is for the city to determine the scope that such review will entail.

CEQA is not to the contrary. The Guidelines recognize that the application of CEQA to a local ordinance is dependent upon the scope and

---

[5]On the other hand, CEQA was not intended to simply generate paperwork. (Guidelines, § 15003, subd. (g).) It requires that decisions be informed and balanced but "must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development or advancement." (Guidelines, § 15003, subd. (j); see *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 6 Cal.4th at p. 1132; *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 576 [276 Cal.Rptr. 410, 801 P.2d 1161].)

interpretation of the ordinance rather than vice versa. Thus, the Guidelines provide: "Whether an agency has discretionary or ministerial controls over a project depends on the authority granted by the law providing the controls over the activity. Similar projects may be subject to discretionary controls in one city or county and only ministerial controls in another." (Guidelines, § 15002, subd. (i)(2).) The Guidelines note that CEQA does not grant an agency new powers independent of the powers granted by other laws. (Guidelines, § 15040, subd. (a).) Rather, the exercise of an agency's authority under a particular law must be within the scope of the agency's authority provided by that law and must be consistent with express or implied limitations provided by other laws. (Guidelines, § 15040, subds. (d) & (e).) The Guidelines also provide that "[t]he determination of what is 'ministerial' can most appropriately be made by the particular public agency involved based upon its analysis of its own laws, and each public agency should make such determination either as a part of its implementing regulations or on a case-by-case basis." (Guidelines, § 15268.)

The issue here is not whether the City's design review ordinance is discretionary or ministerial.[6] Nevertheless, the Guidelines recognize that CEQA does not enlarge an agency's authority beyond the scope of a particular ordinance, and further recognize the fundamental rule that interpretation of the meaning and scope of a local ordinance is, in the first instance, committed to the local agency. Under well-established law, an agency's view of the meaning and scope of its own ordinance is entitled to great weight unless it is clearly erroneous or unauthorized. (See *Wilkinson v. Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 491, 501 [138 Cal.Rptr. 696, 564 P.2d 848]; *Morris v. Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].)

The City's interpretation of its design review ordinance is consistent with the express terms of that ordinance, and CEQA does not compel a different interpretation.

### II*

. . . . . . . . . . . . . . . . . . . . . . . . .

### III

Plaintiff claims the City erred prejudicially in failing to complete a threshold analysis. Had the City done so, according to plaintiff, the relatively

---

[6]The City does not deny that its design review ordinance entails an exercise of discretion. The dispute is not whether the approval of a design review application is ministerial or discretionary, but regards the nature and scope of the review conducted under the design review ordinance.

*See footnote, *ante*, page 1004.

low standard for requiring an EIR would as a matter of law have required further environmental review of the tenant-specific use of the Aggie Village property. As we shall explain, there is no merit in this argument.

CEQA applies to "projects" that, in one way or another, involve governmental authority, including projects undertaken by public agencies, projects supported in some manner by public agencies, and activities that require some form of permit, license, or other entitlement for use granted by a public agency. (Pub. Resources Code, § 21065.) In this sense, "project" refers to the whole of the activity which may require one or more governmental approvals, rather than to each separate governmental approval. (Guidelines, § 15378, subd. (c); *Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 863 [237 Cal.Rptr. 723].)

When two or more public agencies have responsibility over a project, the agency with principal responsibility for carrying out or approving the project is the "lead agency" (Pub. Resources Code, § 21067); any other agency with responsibility for carrying out or approving a project is a "responsible agency" (Pub. Resources Code, § 21069). The University acted as lead agency with respect to the Aggie Village property.[8]

Under CEQA, it is the responsibility of the lead agency to determine whether an EIR shall be required. (Pub. Resources Code, § 21165.) This entails a preliminary review to determine whether the project is subject to CEQA and, if so, whether an exemption applies, followed by an initial study to determine whether the project may have a significant effect on the environment. (Guidelines, §§ 15060-15063.)

At the initial stage of the proceedings, the standard for requiring environmental review is fairly stringent. An EIR is required if the project may have a significant effect on the environment. (Pub. Resources Code, § 21151, subd. (a).) The task of the lead agency is not to determine whether the project will have a significant effect on the environment, but only whether it might have such an effect. An EIR is required whenever it can be "fairly argued on the basis of substantial evidence that the project may have

---

[8]The University was the owner of the property for most of the period of time in which development was contemplated. The University included the proposed retail use of the property in its long-range development plan and in the EIR prepared for consideration of that plan. Thereafter, the University included the commercial use of the property in its project-specific environmental review. The University participated with the City through subsequent reviews and approval processes until all that remained was the design review process and issuance of a building permit. It was at that point that the University issued a request for bids and ultimately agreed to transfer the property to Fulcrum Davis for completion. Under these circumstances, it was appropriate for the University to act as lead agency. (Guidelines, § 15051.)

significant environmental impact." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66]; *Terminal Plaza Corp. v. City and County of San Francisco* (1986) 177 Cal.App.3d 892, 903 [223 Cal.Rptr. 379].) On judicial review of a lead agency's determination that environmental review is not required, the court determines whether the record contains substantial evidence that the project might have a significant environmental effect, and will uphold the determination only where there appears no possibility of such an effect. (*Dunn-Edwards Corp. v. Bay Area Air Quality Management Dist.* (1992) 9 Cal.App.4th 644, 655 [11 Cal.Rptr.2d 850]; *Terminal Plaza Corp. v. City and County of San Francisco, supra,* 177 Cal.App.3d at p. 903.)

This is the standard of review upon which plaintiff bases its argument. However, for reasons that follow, it is not the appropriate standard in this appeal.

As we have noted, the University, as lead agency, included the commercial portion of the Aggie Village in the EIR prepared for its long-range development plan. The University subsequently included the project in a project-specific initial study and negative declaration. The City relied upon these reviews in prezoning and annexing the property. Since the time limitations for challenging these actions have expired, compliance with CEQA is conclusively presumed unless circumstances requiring a subsequent or supplemental EIR are present. (Pub. Resources Code, § 21167.2.)

Public Resources Code section 21166 provides that, when environmental review has been performed, no subsequent or supplemental EIR shall be required by the lead agency or any responsible agency unless (1) substantial changes are proposed in the project that will require major revisions of the EIR, or (2) substantial changes occur with respect to the circumstances under which the project will be undertaken that will require major revisions in the EIR, or (3) new information, which was not known and could not have been known when the EIR was certified, becomes available.[9]

This provision represents a shift in the applicable policy considerations. The low threshold for requiring the preparation of an EIR in the first

_____

[9]Although Public Resources Code section 21166 refers to a situation in which an EIR has been prepared for a project, the Guidelines, section 15162, apply that standard when an EIR has been certified or a negative declaration has been adopted. In *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467 [277 Cal.Rptr. 481], the court upheld application of the standard where a negative declaration has been adopted. (*Id.* at pp. 1478-1481; see also *Snarled Traffic Obstructs Progress v. City and County of San Francisco* (1999) 74 Cal.App.4th 793, 800 [88 Cal.Rptr.2d 455].)

Application of the standard is particularly appropriate here because, although the University adopted a negative declaration with respect to the specific project, the negative declaration was based upon the determination that sufficient environmental review was performed in

instance is no longer applicable; instead, agencies are prohibited from requiring further environmental review unless the stated conditions are met. (*Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1544 [252 Cal.Rptr. 79].)

Thus, Public Resources Code section 21166 provides a balance against the burdens created by the environmental review process and accords a reasonable measure of finality and certainty to the results achieved. (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1074 [230 Cal.Rptr. 413].) At this point, the interests of finality are favored over the policy of favoring public comment, and the rule applies even if the initial review is discovered to have been inaccurate and misleading in the description of a significant effect or the severity of its consequences. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 6 Cal.4th at p. 1130.)

█ Nothing in CEQA requires an agency to perform an initial study before determining whether a subsequent or supplemental EIR may be required. Rather, the determination is made in light of the whole record, and will be upheld on appeal if substantial evidence supports the agency's determination. (*A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1799 [16 Cal.Rptr.2d 358]; *Save San Francisco Bay Assn. v. San Francisco Bay Conservation etc. Com.* (1992) 10 Cal.App.4th 908, 934 [13 Cal.Rptr.2d 117].)

Accordingly, we reject plaintiff's contention that the City was required to conduct an initial study.

In its reply brief, plaintiff clarifies that, by referring to a "threshold" investigation, it is referring to the first step in CEQA's three-step analysis. The three-step analysis consists of (1) a preliminary determination whether the project is subject to CEQA at all, (2) if so, conduct of an initial study, and (3) if necessary, preparation of an EIR. (Guidelines, § 15002, subd. (k).) The preliminary determination is made by the lead agency and consists of the determination whether there is a "project" within the meaning of CEQA and, if so, whether it is exempt from CEQA. (Guidelines, §§ 15002, subd. (k)(1), 15060, 15061.)

No one has claimed here that the Aggie Village development is not a CEQA project or is otherwise exempt from CEQA. Environmental review pursuant to CEQA has been performed, and the question is whether the City, as a responsible agency, is mandated to require additional review pursuant to Public Resources Code section 21166.

---

the EIR for the University's long-range plan. Thus, the Aggie Village Project has been considered in both an EIR and in a project-specific negative declaration.

In determining that additional review was not required, the City was entitled to rely upon the whole record; and we must review, under the familiar substantial evidence rule, the City's determination not to perform further review.

■ The only "change" in the project that plaintiff identifies as requiring additional review is the discovery of the identity of Borders as a prospective retail tenant. It may be assumed that a Borders bookstore would compete with other bookstores in the area. However, under CEQA, the question is not whether a project will affect particular persons, but whether it will affect the environment of persons in general. (*Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 734 [3 Cal.Rptr.2d 488].)

CEQA addresses physical changes in the environment, and under CEQA "[e]conomic and social changes resulting from a project shall not be treated as significant effects on the environment." (Guidelines, § 15064, subd. (e); see Pub. Resources Code, §§ 21060.5; 21151, subd. (b); *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810, 828 [17 Cal.Rptr.2d 766].) Economic and social changes may be addressed under CEQA if they, in turn, will produce changes in the physical environment. (14 Cal.App.4th at p. 828.) They also may be considered with respect to the determination whether physical changes otherwise expected will be significant. (*Ibid.*) But the rule remains that economic and social changes are not, in themselves, significant effects on the environment.[10]

According to plaintiff, the social and economic effects of a Borders bookstore tenancy must be regarded as a matter of law as a potentially significant change in the environment. We disagree.

As has been noted, *ante*, economic and social changes may not be regarded, in themselves, as a significant change in the environment but may be considered if they are associated with a physical change. (Guidelines, § 15064, subd. (e).) However, "[e]vidence of economic and social impacts that do not contribute to or are not caused by physical changes in the environment is not substantial evidence that the project may have a significant effect on the environment." (Guidelines, § 15064, subd. (f)(6).)

A physical change in the environment caused by economic and social factors attributable to a project would be an indirect physical change in the

---

[10]The Guidelines reiterate this rule in defining a significant effect on the environment to mean "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. *An economic or social change by itself shall not be considered a significant effect on the environment.* A social or economic change related to a physical change may be considered in determining whether the physical change is significant." (Guidelines, § 15382, italics added.)

environment. (Guidelines, § 15064, subd. (d)(2).) An indirect physical change may be considered only if it is reasonably likely to occur. (Guidelines, § 15064, subd. (d)(3).) A change which is speculative or unlikely to occur is not reasonably foreseeable. (*Ibid.*)

A determination that a project may have significant environmental effects must be based upon substantial evidence. (Guidelines, § 15064, subd. (f).) The existence of a public controversy is not substantial evidence. (Guidelines, § 15064, subd. (f)(4).) "Argument, speculation, unsubstantiated opinion or narrative, or evidence that is clearly inaccurate or erroneous, or evidence that is not credible, shall not constitute substantial evidence. Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion support[ed] by facts." (Guidelines, § 15064, subd. (f)(5).)

Plaintiff's argument is based solely upon speculation and unsubstantiated opinion. If accepted, plaintiff's position would stand CEQA on its head. CEQA and its implementing guidelines make it clear that social and economic effects are not to be considered a significant environment effect and need be considered only to the extent they are relevant to an anticipated physical change in the environment or, on the basis of substantial evidence, are reasonably likely to result in physical change to the environment. Plaintiff's argument is that, because it is arguably possible that in some instances the establishment of a retail business may have social or economic effects, and because it is arguably possible that in some instances social or economic effects can cause physical changes in the environment, social and economic effects must be addressed in an EIR as a matter of law. We reject such an argument as flatly inconsistent with CEQA and its implementing guidelines.

*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151 [217 Cal.Rptr. 893], relied upon by plaintiff, is not to the contrary. In that case, the county's actions with respect to approval of a regional shopping center had to be set aside for other reasons, and the court undertook to address issues to be considered on remand. (*Id.* at p. 169.) The court held that on remand the lead agency should consider physical deterioration of the downtown area to the extent such a potential is demonstrated to be an indirect environmental effect of the proposed shopping center. (*Id.* at p. 171.) The court did not hold that, as a matter of law, physical change must be presumed from the establishment of a retail business.

Likewise, in *Citizens for Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433 [243 Cal.Rptr. 727], the city's actions had to be set aside for

other reasons, and the issue was addressed for guidance of the city and trial court. (*Id.* at p. 443.) In that case, an EIR had been prepared and it noted the project could pose a significant economic problem for existing businesses, but did not address those effects because, it was asserted, they were beyond the scope of CEQA. (*Id.* at p. 445.) The court held that the city was required to consider business closures and physical deterioration of the downtown area to the extent they were demonstrated to be an indirect environmental effect of the proposed project. (*Id.* at p. 446.) The court did not hold that such effects must be anticipated as a matter of law.

*City of Pasadena v. State of California, supra,* 14 Cal.App.4th 810 is even less helpful to plaintiff. There, the court agreed that social and economic effects may be considered if they cause physical changes. (*Id.* at p. 828.) However, the court held that environmental review is not supported by mere uncorroborated opinion or rumor, and concluded the plaintiff had failed to demonstrate the project would result in physical deterioration of the city. (*Id.* at pp. 828-829.)

Plaintiff's authorities do not establish, and we will not apply, a conclusive presumption that the establishment of a particular retail business requires environmental review. In any event, the circumstances presented in this case are inapposite to those in plaintiff's authorities. First, unlike the situation in plaintiff's authorities, we are here concerned with whether subsequent or supplemental environmental review is required under Public Resources Code section 21166. Accordingly, we are not reviewing the record to determine whether it demonstrates a possibility of environmental impact, but are viewing it in a light most favorable to the City's decision in order to determine whether substantial evidence supports the decision not to require additional review. Second, environmental review of Aggie Village already has encompassed retail use of the property and thus, for our purposes, we must assume that retail tenants will occupy the space. The only issue is whether the identity of Borders as a prospective tenant requires additional review.

Plaintiff's claim is based upon a number of assumptions. It is assumed that existing downtown bookstores will not be able to compete with Borders and will close. It is further assumed that the bookstores will not be replaced by new or different businesses. Finally, it is assumed that the bookstore closures will cause other downtown businesses to close, thus leading to a general deterioration of the downtown area.

. While it appears likely that a Borders bookstore would compete with existing bookstores, we have noted that CEQA is not concerned with effects

on particular persons. (*Association for Protection etc. Values v. City of Ukiah, supra*, 2 Cal.App.4th at p. 734.) The remaining portions of plaintiff's argument are, at best, speculative and conjectural. The City did not act unlawfully in rejecting them and in declining to order subsequent or supplemental review.

IV, V*

. . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Sims, J., and Callahan, J., concurred.

---

*See footnote, *ante*, page 1004.

APPENDIX

Sec. 29-230.1 Revocation.

(a) In the event of a violation of any of the provisions of zoning regulations, or in the event of a failure to comply with any prescribed condition of approval, the planning commission may, after public notice and hearing, revoke any conditional use permit. ·The determination of the planning commission shall become final fifteen days after the date of decision unless appealed to the city council.

(b) Procedures used in considering a revocation of a conditional use permit shall be consistent with those of granting a conditional use permit as detailed·in section 29-221, et seq. (Ord. No. 1329, § 3.)

Article XXVIII. Site Plan·and·Architectural Approval.

Sec. 29-231. Creation of design review process.

A design review process of the city is established. The community development department director shall have the authority to process site plan and architectural approval requests in conformance with this article. (Ord. No. 1694, § 1(part).)

Sec. 29-232. Purpose.

The purpose of the design review process is comprehensive site plan and architectural review so as to determine compliance with this article and to promote the orderly and harmonious growth of the city and the stability of land values and investments and the general welfare; and to help prevent the impairment or depreciation of land values and the development by the erection of structures, additions or alterations thereto without proper attention to·siting, or of unsightly, undesirable or obnoxious appearance; and to prepare for and help to prevent problems arising affecting the community due to the nature of existing and planned uses of land and structures, such as traffic, public, safety, public facilities, utilities and services, among others. (Ord. No. 1694, § 1(part).)

Sec. 29-232.1. .Findings.

The city council finds that poor or inappropriate exterior design of improvements to real property adversely affects the health, safety and welfare of the residents of the city by creating one or more of the following conditions:

(a) The desirability of other properties within the vicinity for the uses for which they are zoned is adversely affected;

(b) The benefits of occupancy of other property in the vicinity are impaired;

(c) Property values within the vicinity do not retain their stability;

(d) The most appropriate development of other properties within the vicinity is impaired;

(e) The maintenance or improvement, or both, of surrounding properties is discouraged with the result that these properties degenerate and there is an accompanying deterioration of conditions which affect the health, safety, comfort and general welfare of the inhabitants of the area and the inhabitants of the city at large;

(f) The proper relationship between the taxable value of real property in the vicinity and the cost of municipal services to these properties is destroyed; and,

(g) The unsightliness which exists causes a decrease in the value of surrounding properties. (Ord. No. 1694, § 1(part).)

Sec. 29-233. Functions of the community development director in the design review process.

The function of the community development department shall be to review the following, with respect to all structures except artwork, single-family and duplex dwelling and accessory buildings:

(a) Siting of all structures as designated upon a site plan;

(b) Landscaping, fencing, other screening as designated on a landscape or sprinkler plan featuring all existing trees and shrubs and proposed plantings;

(c) Design of all circulation and parking and loading facilities for automobiles and bicycles;

(d) Location, design and screening of garbage and recycling facilities;

(e) Details of fencing, and of public work items such as curb cuts, curbs, gutters, sidewalk design, drainage, fire hydrants;

(f) Location, design and intensity of all exterior lighting;

(g) Location and design of addressing system or graphics and mail delivery system;

(h) Location and design of all required open space areas;

(i) Exterior elevations or perspective drawings of structures featuring building height, description of all building materials, building colors, screening of utility meters and mechanical equipment;

(j) Design, placement, dimension, colors of all proposed signs and exterior graphics as limited by the sign section of the zoning ordinance. This shall include building materials, lighting systems and intensity of signs and temporary signs and shall apply to all temporary as well as permanent signing;

(k) Review of sign variance applications pursuant to sections 29-258 to 29-268 of this chapter upon proper administrative review procedures as identified in this chapter;

(l) Review of design and placement of facilities for physically handicapped;

(m) Review of prefabricated, or otherwise constructed, accessory buildings in terms of colors, location and design;

(n) Review design of parks and greenbelts in cooperation with the recreation and park commission;

(o) Review of any other external feature deemed to be materially important to the site or building design; and,

(p) Proposed projects that meet the criteria adopted by resolution for minor improvement projects shall be processed in accordance with the procedures adopted in the resolution. (Ord. No. 1694, § 1(part).)

Sec. 29-233.1. Principles to be followed.

In carrying out the purposes of this article with respect to the external design of buildings and site plans of all proposed new buildings, structures or uses for which site plans and architectural review is required, the following principles shall be applicable:

(a) Review of architectural character shall not be so restrictive that individual initiative is stifled in the design of any particular building or site or that substantial additional expense is required. Rather, it is the intent of this article that the review exercised shall be the amount necessary to achieve the overall objectives of this article;

(b) Good architectural and landscape architectural character is based upon the suitability of a building or site for its purposes; upon the appropriate use of sound materials, good relationship with other structures and the character of the city; and upon the principles of harmony, preparation and design in the elements of the building or site;

(c) Good architectural and landscape architectural character and site planning design are not, in themselves, more expensive than poor architectural character and poor site planning design, and are not dependent upon the particular styles of architecture; and,

(d) Review of sign graphics shall be based upon suitability of the sign colors, placement, design to overall building design and adjacent sign themes. The community development department shall consider the extent, design and location of all temporary signs in the review of sign graphics. (Ord. No. 1694, § 1(part).)

Sec. 29-236.1. Fees and drawings required.

Three copies of accurately scaled drawings shall be submitted with three copies of the application form. The number of copies of such plans to be submitted shall be established by the community development director. The community development department may require submission of amendments to an application before, during or after its review period to reflect more detailed information reasonably necessary for staff to make its determination. (Ord. No. 1694, § 1(part).)

6857

Sec. 29-237. Procedure for action by community develop-
ment department.

The community development department shall write and
distribute a letter of intent of action upon any applica-
tion within thirty days of filing and payments of fees.
Distribution of the letter of intent of action shall be to
the owner of subject property, the applicant of subject
project, and property owners within three hundred feet of
the subject property. A ten-day comment period shall com-
mence at the date of distribution of the letter, enabling
interested parties to comment on the project. At the end
of the ten-day comment period the community development
department director shall approve such application, disap-
prove such application or approve the same subject to con-
ditions, specified changes or additions. The applicant
shall be notified in writing of the action taken. (Ord.
No. 1694, § 1(part).)

Sec. 29-237.1. Review procedures.

The review procedure for all applications may consist
of a preliminary plan and a final plan or just the latter.
The community development department encourages a prelimi-
nary and final plan in instances of large or complicated
development projects.

Preliminary review by the community development de-
partment has the following purposes:

(a) Indicate to the applicant major areas of defi-
ciency and good design;

(b) Instruct the applicant as to sections of the
project which are unacceptable or need minor revision; and,

(c) Inform the community development department on
the scope of the project of the final review stage. (Ord.
No. 1694, § 1(part).)

Sec. 29-237.2. Appeals.

Any community development department determination
pursuant to this article may be appealed to the planning
commission upon written request for a hearing before the
commission. Such appeal shall specify with reasonable
certainty the portion or portions of staff determinations
which the applicant feels to be in error. Such appeal
shall be accompanied by a fee set by resolution by the city
council for such purposes. In the absence of such a re-
quest for a hearing being filed within fifteen calendar

days after the determination of the community development department, such determination is final. (Ord. No. 1694, § 1(part).)

Secs. 29-238--29-238.2. Repealed by Ordinance No. 1627, § 2.

### Article XXIX. Reserved.

Secs. 29-239--29-244. Repealed by Ordinance No. 1444, § 13.

### Article XXX. Planned Unit Development Approval.

### Sec. 29-245. Purpose of article.

The purpose of planned unit development approval is to allow diversification in the relationship of various buildings, structures and open spaces in planned building groups and the allowable heights of such buildings and structures, while insuring substantial compliance with the regulations and provisions of this chapter, in order that the intent of this chapter in requiring adequate standards related to the public health, safety and general welfare shall be observed without unduly inhibiting the advantages of modern large-scale planning for residential, commercial or industrial purposes. Provisions for a more desirable living environment than would be possible through the strict application of the requirements of this chapter are encouraged. Developers are encouraged to use more creative approaches in the development of land, to encourage more efficient, aesthetic and desirable use of open areas and open land and to encourage variety in the physical development pattern of the city. (Ord. No. 296, § 31.1.)

### Sec. 29-246. Repealed by Ordinance No. 1444, § 14.

### Sec. 29-247. Repealed by Ordinance No. 1444, § 14.

### Sec. 29-248. Minimum areas.

No application shall be made for an area of less than one acre for any proposed use. (Ord. No. 296, § 31.4; Ord. No. 580, § 2.)

### Sec. 29-249. Change of zoning district.

No application under this article shall be accepted for a use which will require .

6859