[No. A084462. First Dist., Div. Four. Aug. 31, 1999.]

SNARLED TRAFFIC OBSTRUCTS PROGRESS, Plaintiff and Appellant,
v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents;
SAN FRANCISCO DEPARTMENT OF PARKING AND TRAFFIC, Real
Party in Interest and Respondent.

**COUNSEL**

Kelly L. Drumm and Laurens H. Silver for Plaintiff and Appellant.

Louise H. Renne, City Attorney, Judith A. Boyajian and Lisa-Anne M. Wong, Deputy City Attorneys, for Defendants and Respondents and for Real Party in Interest and Respondent.

**OPINION**

**POCHÉ, Acting P. J.**—The subject of this appeal is application of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] to a project which received approval in 1988 without preparation of an environmental impact report (EIR) but which then lay dormant for nine years. The primary issue is whether the negative declaration given the project in 1988 should be deemed superseded by subsequent events, thereby requiring an EIR. The trial court denied a petition for a writ of administrative mandamus upon concluding that municipal authorities did not abuse their discretion in determining that proposed modifications to the project did not entail new or more significant environmental impacts from those considered in 1988. The trial court further concluded that the negative declaration therefore remained valid. We conclude these conclusions have the support of substantial evidence and therefore affirm.

BACKGROUND

The project at issue involves the demolition of an existing two-story parking structure located in downtown San Francisco, and its replacement

---

[1]Statutory references are to this code unless otherwise indicated. References to "Guidelines" are to the regulatory guidelines which implement CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.).

with a larger structure up to seven stories high (sixty-five feet). The existing structure, and an adjacent lot, could accommodate 125 cars; the completed project would have up to 330 parking stalls. The original proposal also specified that the ground floor of the new structure was to be given over to 10,000 to 13,000 square feet of retail stores. A negative declaration was approved with the finding that the project would not have significant impacts on the surrounding environment.

For reasons not entirely clear from the record, no further action was taken and the project remained dormant until 1997, when officials of the city's department of parking and traffic (DPT) began working on a modified version of the project. The revised plan was for a 40-foot high structure with only about 200 parking stalls and no ground floor retail stores. San Francisco's environmental review officer analyzed the 1988 negative declaration in light of more recent information and concluded that no material change of circumstances impaired the soundness or validity of the negative declaration. Based in part on this review, the city's planning commission approved a conditional use authorization for the revised project. At the same time the city's zoning administrator granted the project a variance from rear yard set-aside requirements of the San Francisco Planning Code.

The requests for the variance and the conditional use authorization were opposed by Snarled Traffic Obstructs Progress (STOP), which describes itself as "an uni[n]corporated non-profit association comprised of property owners and residents who live and work in the immediate vicinity" of the project. STOP's appeal was rejected by the board of appeals, which approved the variance as modified by DPT with a reconfiguration that would reduce adverse impacts to the light, air, and views of the occupants of two residential hotels adjacent to the project. Thereafter the city's parking authority approved the final design for the project.

STOP then filed a petition for injunctive and declaratory relief, and for a writ of administrative mandamus. The general object of the petition was to overturn previous approvals of the project pending "subsequent and/or supplemental environmental review" of "new and legally adequate environmental documentation." Upon consideration of the merits, the trial court denied all relief, a ruling embodied in the judgment from which STOP perfected this timely appeal.

REVIEW

I

As a general rule, CEQA requires the preparation of an EIR whenever a public agency proposes to approve or carry out a project that may

have a "significant effect" on the environment. (§§ 21080, 21100, 21151; Guidelines, §§ 15002, 15063.) If, however, the public agency determines that the project will not have a significant environmental impact, it can issue a negative declaration to that effect and forego an EIR. (§§ 21064, 21080, subd. (c); Guidelines, §§ 15063, 15064, 15070.) In an obvious sense, an EIR and a negative declaration are the two sides of the same coin, the either/or options available to a public agency considering a project. Again, as a general rule, once a negative declaration is issued or an EIR is completed, that decision is protected by concerns for finality and presumptive correctness. (§ 21167.2; *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112, 1130 [26 Cal.Rptr.2d 231, 864 P.2d 502].)[2]

However, section 21166, augmented by Guidelines section 15162, delineate the circumstances when the subject may be reopened or revisited. Guidelines section 15162 provides in pertinent part:

"(a) When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at

---

[2]STOP appears to imply that the 1988 negative declaration was somehow defective or inadequate because it employed an "Environmental Evaluation Checklist." If this was the sole basis for the negative declaration, it might be vulnerable; such a "bare bones" approach will not satisfy CEQA. (See *Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296, 305-307 [248 Cal.Rptr. 352]; *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 171 [217 Cal.Rptr. 893].) The checklist used here, however, was attached to the negative declaration consisting of four pages of dense text that satisfy the requirements for a negative declaration set out in Guidelines section 15071. In any event, the time for challenging the 1988 decision is long expired. (§ 21167; Guidelines, § 15112; *Temecula Band of Luiseno Mission Indians* v. *Rancho Cal. Water Dist.* (1996) 43 Cal.App.4th 425, 430 fn. 3, 433-434 [50 Cal.Rptr.2d 769].)

the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

"(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;

"(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative;

". . . . . . . . . . . . . . . . . . . . . .

"(b) If changes to a project or its circumstances occur or new information becomes available after adoption of a negative declaration, the lead agency shall prepare a subsequent EIR if required under subsection (a). Otherwise the lead agency shall determine whether to prepare a subsequent negative declaration, an addendum, or no further documentation. . . ."[3]

The issue for us, as for the trial court, is whether there is substantial evidence to support the determination that the proposed modifications for the project did not require either changes in the 1988 negative declaration or preparation of an EIR. (E.g., §§ 21168, 21168.5; *A Local & Regional Monitor* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1793 [16 Cal.Rptr.2d 358]; *Benton* v. *Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1481-1482 [277 Cal.Rptr. 481].) In determining that issue, all reasonable doubts are resolved in favor of the administrative decision. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 6 Cal.4th 1112, 1135.)

We have visited this subject before. In *Benton* v. *Board of Supervisors, supra,* 226 Cal.App.3d 1467, we confronted a situation where a permit had

---

[3]The enabling authority for Guidelines section 15162 is section 21166, which provides in pertinent part: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required . . . unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

been given to a property owner for construction of a winery after the appropriate authority had issued a negative declaration. The permit holder then purchased an adjacent parcel and sought to transfer the permit to it, in effect moving the winery project, which was changed considerably. A new permit was authorized, following another negative declaration. The trial court refused to issue a writ of administrative mandamus because an EIR had not been prepared. (*Id.* at pp. 1473-1474.) We affirmed that conclusion, but we did not agree with the trial court that the property owner was applying for a new permit. We concluded that the permit should be viewed as a modification of the project already commenced. (*Id.* at pp. 1475-1477.) Central to our reasoning was that the project had already received "full," "in-depth," and "final CEQA review." (*Id.* at pp. 1477, fn. 10, 1479, 1482.) Moving from this conclusion to an examination of section 21166—the enabling statutory authority for Guidelines section 15162—we determined that the rules governing the circumstances in which a subsequent or supplemental EIR must be prepared also apply to situations where a negative declaration was adopted: "In a case in which an initial EIR has been certified, section 21166 comes into play precisely because in-depth review of the project has already occurred, the time for challenging the sufficiency of the original CEQA document has long since expired, and the question before the agency is whether circumstances have changed enough to justify repeating a sub-stantial portion of the process. [Citations.] These same principles apply with even greater force in a case such as this, in which the initial environmental review resulted in the issuance of a negative declaration, rather than an EIR. If a limited review of a modified project is proper when the initial environ-mental document was an EIR, it stands to reason that no greater review should be required of a project that initially raised so few environmental questions that an EIR was *not* required, but a negative declaration was found to satisfy the environmental review requirements of CEQA. To interpret CEQA as requiring a greater level of review for a modification of a project on which a negative declaration has been adopted and a lesser degree of review of a modified project on which an EIR was initially required would be absurd." (226 Cal.App.3d at pp. 1479-1480, original italics.) This theme of resisting the appellants' call for plenary review of the project since its inception and de novo review of the modification approval was also evident from the manner in which we approached the issue of whether that approval was supported by substantial evidence: "[The appellants] contend that all impacts of the larger project—even those already approved as part of the initial CEQA review process—must again be considered. Their arguments might be persuasive if the project under review by the board had been the original winery. But the original winery was not before the board when it issued this mitigated negative declaration; it had already survived environ-mental review. The only item subject to board approval was modification of

the original permit to allow relocation of the winery building on the enlarged site." (*Id.* at p. 1482.) We then concluded that the appropriate standard of review was whether the board's decision was supported by substantial evidence, which we found it was. (*Id.* at pp. 1481-1483.)

*Benton* is of considerable assistance in narrowing our inquiry. First of all, the basis for reversing an initial environmental review (i.e., the decision to adopt a negative declaration or to prepare an EIR) because there is a "fair argument" that a proposed project may have a significant effect on the environment, even if there is substantial evidence to the contrary (see *Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 6 Cal.4th 1112, 1123, and authorities cited; *Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316-1318 [8 Cal.Rptr.2d 473]), has no application here because the time for challenging the 1988 adoption of the negative declaration has long since passed. (See fn. 2, *ante.*) We shall therefore disregard the insinuations in STOP's briefs concerning that decision. Second, *Benton* gives us authority to treat the 1997 agency actions as merely the approval of a modified version of the project, a project that had already undergone in-depth environmental review. (See also our decision in *Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065 [230 Cal.Rptr. 413] [modified subdivision plan did not require new EIR].) Third, we shall also treat the 1997 actions as the functional equivalent of a second negative declaration for purposes of section 21166 and Guidelines section 15162. Finally, following *Benton* and numerous recent decisions, we shall examine the record only to determine whether the 1997 actions are supported by substantial evidence. (See *Sierra Club* v. *County of Sonoma, supra,* at pp. 1317-1318 and decisions cited.)[4]

The initial approval was to replace a parking structure with a bigger parking structure. The modified version was still a parking structure but one

---

[4] In light of our limited function, authorities cited by STOP in which a reviewing court found substantial evidence supported an agency decision to require an EIR (e.g., *Security Environmental Systems, Inc.* v. *South Coast Air Quality Management Dist.* (1991) 229 Cal.App.3d 110 [280 Cal.Rptr. 108]) are obviously distinguishable. STOP also cites a pair of decisions for the proposition that whether an EIR is required by Guidelines section 15162 is an issue of law. (E.g., *Mira Monte Homeowners Assn.* v. *County of Ventura* (1985) 165 Cal.App.3d 357 [212 Cal.Rptr. 127]; *Environmental Council* v. *Board of Supervisors* (1982) 135 Cal.App.3d 428 [185 Cal.Rptr. 363].) To the extent these decisions hold that agency decisions are not supported by substantial evidence, they are unexceptionable. If, however, they are read as overturning an agency determination regardless of whether there is substantial evidence in support of that determination, *Benton* and a host of other decisions oblige us to follow a different approach. (See *Sierra Club* v. *County of Sonoma, supra,* 6 Cal.App.4th 1307, 1317-1318 [citing *Benton* and other decisions for applying substantial evidence rule to decisions under section 21166 subsequent to full environmental review: "if there are conflicts in the evidence, their resolution is for the agency"].)

more modest in scope; it would be less tall and with a smaller capacity than originally proposed. The surrounding area was described as "high-density neighborhood-commercial" in 1988; the city's environmental review officer reported in 1997 that "the subject site and its surrounding area have not changed substantially since 1988, either in terms of land uses, intensity of use, or physical development." That officer also concluded that "no physical or environmental characteristics of the modified project proposal and no changes in circumstances in the site vicinity would change any of the conclusions of the original Negative Declaration." These circumstances, and the environmental review officer's report, constitute substantial evidence for the conclusion that the revised proposal did not involve "new significant environmental effects or a substantial increase in the severity of previously identified significant effects" within the meaning of Guidelines section 15162, subdivision (a)(1) and (2).[5]

STOP argues that the modified version of the project has a larger "footprint," that is to say, that it will occupy more of the total space of the two lots than would the version approved in 1988. The 1988 negative declaration did not set forth how much square footage of the lots would in fact be occupied by the project as originally proposed and approved. STOP's argument is therefore dependent upon an inference that the original project was conceived and approved on the assumption that there would be an undeveloped rear yard space of at least 15 feet, as required by San Francisco Planning Code section 134. A zoning administrator testified before the board of appeals, however, that both the original and the modified versions "would have required a rear yard variance . . . . Accordingly, I believe that any potential environmental impacts to the variance were analyzed in the original negative declaration on the larger project." Based on this evidence, the trial court concluded that STOP "has not met its burden of showing evidence in the record that the original project would have utilized a smaller portion of the lot." The court further concluded as follows: "The originally proposed project was fifteen feet higher than the current project which might have had a greater impact on the access to air, light and views than a lower structure that extends further back into the rear-yard set back area . . . . [T]he Court finds that while the impacts from the modified project may be different from the original project, the incremental effect of the new action does not result in impacts that rise to the level of significance requiring further review under CEQA." We discern no basis for overturning either of these alternate

---

[5] An entirely different result might be required if instead of reducing the the proposed project's size the revised proposal had increased it. (Cf. *Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929 [231 Cal.Rptr. 748, 727 P.2d 1029] [§ 21166 required supplemental EIR for outdoor theater approved for 5,000 seats on 6 acres changing to 15,000 seats on 10 acres].)

grounds. (See *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr. 426, 764 P.2d 278] [substantial evidence includes inferences and reasonable doubts resolved in favor of administrative action].)

This reasoning will also dispatch STOP's contention that the increased "footprint" of the revised project will have a significant impact on the residents of the two residential hotels adjacent to the project site, specifically, the residents' light, air, and views would be impeded if not obliterated if the parking structure is built according to the revised plans. There is no suggestion that these hotels were constructed after 1988. They would therefore have been considered in the process culminating in the negative declaration of that year. As just shown, there was no firm commitment at that time to a particular configuration of the project. The revised project proposal would thus not necessarily entail new and negative aesthetic impacts for the hotel residents. Moreover, the trial court found that these "potential impacts do not rise to the level of significance" because they were "mitigated by the project sponsor's modification of the project." The zoning administrator described this modification as follows: "As a result of negotiations with adjacent property owners, plans have been revised to establish a setback of 16 feet by 26.75 . . . at the second level, and 16 feet by 31.75 feet at the third and fourth levels. This staggered setback provides an expanding 'light well' for the residential levels of the adjacent building[s]. . . . [¶] This revision . . . has the support or acquiescence of the affected property owners . . . ." A letter from a parking authority director was to the same effect. The zoning administrator told the board of appeals that these property owners "also represent the occupants of the propert[ies]" and that this latest revision would further reduce the number of parking spaces in the project. The executive director of the DPT also told the board of appeals that "The neighbors directly affected, both residents and owners, are in favor of the project." Others speaking to the board also conveyed the same general message. It may also be significant that after the "light well" revision was made, not a single resident of the neighboring hotels spoke against the project before the board of appeals. Taken in its entirety, all of this amounts to substantial evidence in support of the trial court's refusal to issue the writ.

II

STOP's only remaining contention is that exemption from the rear yard set-aside requirement should have been sought in the form of a waiver under section 134 of the city's planning code, instead of the variance obtained under section 305 of the same code. Having looked at both statutes, we

discern in the former nothing like jurisdictional exclusivity. We agree with the trial court that these statutes "are two different mechanisms for reaching the same result." In *Benton* we noted that agreement with an appellate contention "would constitute a triumph of form over substance." (*Benton* v. *Board of Supervisors, supra,* 226 Cal.App.3d 1467, 1476.) That characterization is equally useful here, for we think it makes no appreciable difference-which statute was used to obtain the exemption.

The judgment is affirmed.

Reardon, J., and Sepulveda, J., concurred.

A petition for a rehearing was denied September 23, 1999, and appellant's petition for review by the Supreme Court was denied November 23, 1999.