[No. A111278. First Dist., Div. Five. Nov. 17, 2006.]

AMERICAN CANYON COMMUNITY UNITED FOR RESPONSIBLE GROWTH, Petitioner and Appellant, v.
CITY OF AMERICAN CANYON et al., Defendants and Respondents,
LAKE STREET VENTURES, L.L.C., et al., Real Parties in Interest.

[No. A112088. First Dist., Div. Five. Nov. 17, 2006.]

CITIZENS AGAINST POOR PLANNING et al., Petitioners and Appellants, v.
CITY OF AMERICAN CANYON et al., Defendants and Respondents,
LAKE STREET VENTURES, L.L.C., et al., Real Parties in Interest.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of court, rules 976(b) and 976.1, the opinion is certified for publication with the exception of Part III.

## COUNSEL

Herum Crabtree Brown, Steven A. Herum and Brett S. Jolley for Petitioner and Appellant American Canyon Community United for Responsible Growth.

Somach, Simmons & Dunn, Timothy M. Taylor, Christian C. Scheuring and Jacqueline L. McDonald for Petitioners and Appellants Citizens Against Poor Planning and Stacy Su.

Law Offices of William D. Ross, William D. Ross, Noemi Cruz and Kypros G. Hostetter for Defendants and Respondents.

Steefel, Levitt & Weiss, Judy V. Davidoff, Arthur J. Friedman and Amy B. Briggs for Real Parties in Interest.

## OPINION

**GEMELLO, J.**—The City of American Canyon (City) adopted a mitigated negative declaration for a multiuse development project that was to be constructed in two phases. After the negative declaration and the project approval became final, the developer changed the size and type of retail development proposed for phase two of the project, replacing a shopping center with a 24-hour supercenter that combined a big-box discount store and a full grocery store. The City approved the supercenter proposal without requiring supplemental environmental review under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) or a major modification approval or conditional use permit under its zoning ordinance.

We conclude that the City prejudicially violated CEQA. First, the City unreasonably minimized the size increase in the phase two retail component. That error fatally undermined the validity of the City's updated traffic analysis. The City's determination that the project changes would not substantially increase the project's impact on traffic is not supported by substantial evidence. Second, the City failed to proceed as required by law when it

refused to consider the extraterritorial effects of the proposed supercenter, specifically the urban decay effects that might result from store closures in neighboring cities caused by economic competition from the supercenter.

We also conclude that the City prejudicially violated its zoning ordinance by approving the supercenter without approving a major modification application. We reject appellants' other claims of zoning ordinance violations.

BACKGROUND

*Master Plan Approval in 2003*

On July 10, 2003, Lake Street Ventures (Developer) applied for land use approvals for a development called Napa Junction Project (Project) to be located on a 40-acre site on Highway 29 in American Canyon.[1] The Project consisted of three main components, a hotel, multifamily residences with a park, and retail space. Developer planned to develop the Project in two phases of approximately 20 acres each. Phase one consisted of approximately 32,000 square feet of retail space, the hotel and the multifamily housing. Phase two added about 165,000 square feet of retail space in various size buildings and pad sites on the northern half of the property.

With its application for design permit of phase one, the developer submitted a site plan and a landscape plan. The site plan showed a detailed layout of the phase one area, but the phase two area was simply a blank space with the notations "163,000 SF developable area" and a "future road" indicated by dotted lines running north to south. The Project's landscape plan, on the other hand, showed a detailed layout for phase two, which included a roadway, parking areas, and at least eight retail buildings or pads.

In October 2003, the City issued an Initial Study and Mitigated Negative Declaration of Environmental Impact (MND). The MND incorporated the Project site plan, which showed an essentially blank phase two area. The MND also incorporated a traffic study (MND Traffic Study), which analyzed site access to and internal circulation within the Project based on the landscape plan, which showed a detailed layout for the phase two area.

In accord with the planning commission's recommendation, the city council adopted the MND and approved the Project in December 2003 by adopting a zoning ordinance and map amendment, a general plan amendment, and a tentative map.

---

[1] Napa Junction I, LLC, another real party in interest in this action, is Lake Street Ventures's successor in interest.

*Wal-Mart Supercenter Proposal in July-August 2004*

In July and August 2004, Wal-Mart applied for a design permit and a sign program for the proposed construction of a Wal-Mart supercenter in the phase two area of the Project. The proposed supercenter would operate seven days a week, 24 hours a day and would include a full-service grocery department in addition to a general merchandise department. The planning commission staff reported, "The proposed site plan would locate an approximately 173,653-square-foot building and a 12,676-square-foot outdoor garden center on a 15.48-acre site at the northeast corner of the Napa Junction property, separated by a parking lot from Highway 29. An outdoor seasonal event sales area of 7,625 square feet is proposed in the parking lot near the southern building entrance and would occupy 24 parking spaces when in use. [¶] . . . [¶] The remaining portion of Phase II at the southeast corner of Highway 29 and Napa Junction Road is reserved for future uses and will be subject to separate design review."

Public concern about the proposed supercenter emerged almost immediately. American Canyon Community United for Responsible Growth (Appellant) formed and demanded CEQA review. City staff advised the planning commission that further CEQA review was unnecessary: "The subject project includes 154,074 square feet of commercial uses (excluding the stockroom, employee use area and seasonal events sales area), which when added to the 37,930 square feet of commercial uses currently planned for Phase I, is consistent with the 196,000 square feet evaluated by the Mitigated Negative Declaration for the entire Napa Junction project. [¶] Because there are no substantial changes that have occurred . . . that would require revisions to the previously-approved Mitigated Negative Declaration, . . . further California Environmental Quality Act documentation is not needed." Following a heavily attended public hearing and the receipt of conflicting legal opinion letters from the city attorney and Appellant, the planning commission approved the supercenter on the condition that the hours be restricted to 6:00 a.m. to midnight. The commission found that further environmental review of the Project was not required.

Appellant appealed the commission's decision to the city council, and Wal-Mart appealed the restriction on its operating hours. The city manager provided the city council with a fiscal impact report analyzing the costs and revenues the City could expect if the supercenter proposal went forward. In response, Appellant submitted its own expert's study of the economic effects of the supercenter, which included regional store closures that could lead to urban decay. Appellant also submitted several studies of the effects of supercenter development in other areas of the country.

City staff released a revised trip generation analysis for the Project, which evaluated the number of vehicle trips that would be generated by the Project if it included the supercenter. Using 154,074 as the square footage of the supercenter, the analysis projected traffic at levels below those projected in the MND Traffic Study. Appellant responded by submitting its own traffic studies that concluded the Project with the supercenter would generate significantly more traffic than had been projected in the MND Traffic Study.

Following public hearings, the city council approved the design permit application and sign program and reversed the planning commission's restriction on the supercenter's operating hours. The City issued a notice of determination that the Project would not have a significant effect on the environment.

*Trial Court Proceedings*

Appellant filed a petition for writ of mandate in the superior court seeking revocation of the City's approval of the supercenter proposal. Appellant argued the approval violated CEQA and the City's zoning ordinance. Citizens Against Poor Planning, an organization that formed after the supercenter was approved, and Stacy Su (collectively, Citizen Appellants) also filed a petition for a writ of mandate challenging the supercenter approval and also asserted CEQA and zoning ordinance violations. The actions were consolidated in the superior court.

The trial court denied the petitions. It concluded that the City's determination that no supplemental environmental review was necessary was supported by substantial evidence in the administrative record. On the alleged zoning ordinance violations, the court found either that the City complied with the ordinance or that its noncompliance was nonprejudicial.

Both petitioners appealed. Appellant raises several CEQA issues and argues the City prejudicially violated its zoning ordinance. The City filed a protective cross-appeal arguing it did not violate its zoning ordinance. Citizen Appellants filed an appeal that focuses on a single CEQA issue, whether the City violated CEQA by failing to consider cross-jurisdictional impacts. While the appeals were pending, Appellant filed two petitions for writs of supersedeas seeking stays of construction of the super center. This court denied both petitions and expedited briefing of the appeals.

DISCUSSION

After discussing the applicable standard of review, we address the CEQA issues raised on appeal and then proceed to the zoning ordinance issues.

## I. *Standard of Review*

Judicial review in an administrative mandamus action is limited to ascertaining "whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) This standard governs our review of the City's compliance with CEQA and with its zoning ordinance. (*Lucas Valley Homeowners Assn. v. County of Marin* (1991) 233 Cal.App.3d 130, 142 [284 Cal.Rptr. 427]; Code Civ. Proc., § 1094.5; Pub. Resources Code, § 21168;[2] see also *Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1071–1072 & fn. 7 [230 Cal.Rptr. 413] (*Bowman*) [same standard of review under §§ 21168, 21168.5].)

The scope of our review is identical with that of the superior court. (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 334 [25 Cal.Rptr.2d 842].) We examine all relevant evidence in the entire record, considering both the evidence that supports the administrative decision and the evidence against it, in order to determine whether or not the findings of the agency are supported by substantial evidence. (*Id.* at p. 335.) Substantial evidence is evidence of ponderable legal significance, reasonable in nature, credible, and of solid value, evidence that a reasonable mind might accept as adequate to support a conclusion. (*Ibid.*) The burden is on the appellant to show there is no substantial evidence to support the findings of the agency. (*Id.* at p. 336.)

## II. *CEQA Issues*

After providing an overview of the relevant legal standards under CEQA, we address and reject Appellant's argument that section 21166 does not govern our review because phase two is a new project. We then apply the standards of section 21166,[3] considering first whether the City accurately identified the changes in the previously-approved Project; second, whether

---

[2] All statutory references are to the Public Resources Code unless otherwise indicated.

[3] Section 21166 reads: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

the project changes would have a substantially increased effect on traffic; and third, whether the City violated CEQA by refusing to consider possible extraterritorial urban decay effects of the supercenter.

When a local agency intends to carry out or approve a project covered by CEQA, the agency must prepare and certify the completion of an environmental impact report (EIR) if the project *may* have a significant effect on the environment. (§ 21151, subd. (a).) "An EIR is required whenever it can be 'fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citations.]" (*Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1016–1017 [100 Cal.Rptr.2d 413] (*Friends of Davis*).) When, on the other hand, "[t]here is no substantial evidence, in light of the whole record before the lead agency, that the project may have a significant effect on the environment," the lead agency must prepare a negative declaration to that effect. (§ 21080, subd. (c)(1); see Guidelines, §§ 15064, subd. (f)(3), 15070.)[4] The agency must prepare a mitigated negative declaration when "[a]n initial study identifies potentially significant effects on the environment, but (A) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (B) there is no substantial evidence, in light of the whole record before the lead agency, that the project, as revised, may have a significant effect on the environment." (§ 21080, subd. (c)(2); see Guidelines §§ 15064, subd. (f)(2), 15070.)

As noted above, the City adopted an MND for the Project and approved the Project in 2003. Since the time limitations for challenging the MND have expired, the City's compliance with CEQA at that stage of the proceedings is conclusively presumed. (§ 21167.2.) Appellants do not contest the City's compliance with CEQA when it approved the Project in 2003.

When an agency has prepared an EIR, it shall not require a subsequent or supplemental EIR to be prepared unless, as relevant here, "[s]ubstantial changes are proposed in the project which will require major revisions of the environmental impact report." (§ 21166, subd. (a).) Although the statute speaks only in terms of the EIR, CEQA Guidelines apply section 21166 to

---

[4] All references to "Guidelines" are to the state CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.). The Supreme Court "has not decided the issue of whether the Guidelines are regulatory mandates or only aids to interpreting CEQA . . . . At a minimum, however, courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).)

project changes following an agency's adoption of a negative declaration or a mitigated negative declaration as well as an EIR, and this interpretation has been upheld. (Guidelines, § 15162; *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1477–1481 [277 Cal.Rptr. 481] (*Benton*).)

Guidelines section 15162 provides in part: "(a) When . . . a negative declaration [has been] adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following: [¶] (1) Substantial changes are proposed in the project which will require major revisions of the previous . . . negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects . . . [¶] . . . [¶] (b) If changes to a project . . . occur . . . after adoption of a negative declaration, the lead agency shall prepare a subsequent EIR if required under subdivision (a). Otherwise the lead agency shall determine whether to prepare a subsequent negative declaration, an addendum, or no further documentation."

Section 21166 and Guidelines section 15162 (hereafter, collectively referred to as section 21166) represent "a shift in the applicable policy considerations. The low threshold for requiring the preparation of an EIR in the first instance is no longer applicable; instead, agencies are prohibited from requiring further environmental review unless the stated conditions are met. [Citation.]" (*Friends of Davis v. City of Davis, supra,* 83 Cal.App.4th at pp. 1017–1018.) "[S]ection 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process." (*Bowman, supra,* 185 Cal.App.3d at pp. 1073–1074.)

The issue before us is whether, in light of the whole record, there is substantial evidence to support the City's determination that the proposed changes in the Project would not create significant new or substantially increased environmental effects requiring major revisions in the MND or preparation of an EIR. (See Guidelines, § 15162, subd. (a)(1); *Snarled Traffic Obstructs Progress v. City and County of San Francisco* (1999) 74 Cal.App.4th 793, 798 [88 Cal.Rptr.2d 455].)

### A. *Section 21166 Applies*

As a preliminary matter, we conclude section 21166 governed whether further environmental review of the supercenter proposal was required under CEQA. Appellant argues that the project is not subject to section 21166

because the supercenter proposal was essentially a new project, not a change in the original Project.

In support of its argument, Appellant relies on *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307 [8 Cal.Rptr.2d 473]. *Sierra Club* discussed section 21166 in the context of tiered EIR's. (*Sierra Club*, at pp. 1318–1320.) A separate statutory scheme within CEQA governs tiered EIR's. Tiered EIR's are used when an agency prepares a *program EIR* for an extensive land use proposal that will encompass multiple site-specific projects. (*Sierra Club*, at pp. 1318–1320.) An EIR is required for a site-specific project within the larger program if the project *may* cause significant effects on the environment. (*Id.* at p. 1319; § 21094.) This standard applies *unless* the agency determines the project is subject to section 21166. (*Sierra Club*, at p. 1319; § 21094, subd. (b).) In the context of tiered EIR's, *Sierra Club* held that section 21166 governed "only when the question is whether more than one EIR must be prepared for what is *essentially the same project.*" (*Sierra Club*, at p. 1320, italics added.) The project at issue was a proposal to change the mining and agricultural use designations for specific parcels of land and to allow mining on one of the newly designated mining parcels. The court held that this project was not essentially the same as the proposal considered in the program EIR, a proposed countywide management plan for gravel and hard rock mining. (*Id.* at pp. 1313–1314, 1320–1321.) Thus, section 21166 did not apply. (*Sierra Club*, at p. 1321.)

Here, the supercenter proposal was not a specific application of a larger management plan that was evaluated in a program EIR. Rather, it was a proposed change (from a shopping center to a supercenter) in phase two of the same multiuse development that was evaluated in the 2003 MND. This project change is comparable to the project changes held to be subject to section 21166 in several appellate court decisions: the reconfiguration of a medical research and laboratory complex in *Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538 [252 Cal.Rptr. 79] (*Fund for Environmental Defense*); the modification of a proposed subdivision in *Bowman, supra*, 185 Cal.App.3d 1065; and the relocation of a winery in *Benton, supra*, 226 Cal.App.3d 1467. (*Sierra Club v. County of Sonoma, supra*, 6 Cal.App.4th at p. 1320.) Section 21166 applies to the project change.

### B. *The City Did Not Accurately Identify the Changes to the Project*

The first step in determining whether supplemental environmental review is required under section 21166 is to identify the changes in the project that

were not considered in the original environmental review document. Aspects of the Project that were known at the time of the MND are not subject to our review because the MND, even if flawed, is final and not subject to reconsideration. (§ 21167.2.) The parties disagree about how the supercenter proposal differed from the original Project. We conclude that the supercenter proposal substantially changed the type and size of the retail component of phase two.

### 1. *Identity of Tenant*

Preliminarily, we reject respondents' assertion that this appeal is fundamentally a challenge to the identity of the tenant in phase two, rather than to the nature of the development. The identity of a tenant is irrelevant to CEQA review. (*Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 443–449 [15 Cal.Rptr.3d 322].) Here, appellants base their argument on the particular type of retail use proposed, a supercenter consisting of a big-box discount store combined with a full grocery store, rather than the identity of the company that plans to operate the supercenter. It may be that Wal-Mart is the only company that operates supercenters in this region, but that fact does not convert appellants' arguments into a challenge to the identity of the tenant.

It also may be that appellants are motivated by opposition to Wal-Mart's policies that are unrelated to the environmental effects of this proposed supercenter development. Those motivations are also irrelevant to our analysis. As the Fifth District declared in a similar CEQA case challenging the construction of a Wal-Mart supercenter, we give no weight to insinuations that Wal-Mart is a destructive economic force inherently inferior to smaller merchants, or that community organizations opposing Wal-Mart are front organizations defending the narrow economic interests of unionized workers or economic competitors. "[W]e have no underlying ideological agenda and have strictly adhered to the accepted principle that the judicial system has a narrow role in land use battles that are fought through CEQA actions." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1196 [22 Cal.Rptr.3d 203] (*Bakersfield Citizens for Local Control*).) Our role is to decide whether there is substantial evidence in light of the whole record to support the City's determination that this supercenter proposal would not have significant new or substantially increased effects on the environment requiring major revisions in the MND or preparation of an EIR.

## 2. *Change in Type of Retail Use*

The city attorney argued to the superior court that the character of the retail development in phase two had not changed: "the real land use was determined in December of 2003. The footprint was clearly established. It was known to be a big box store." Wal-Mart somewhat weakly revives the point on appeal. The record does not support the argument.

The original Project proposal stated, "Phase Two will complete the smaller retail buildings and pad sites along the highway frontage as well as add larger retail 'box' tenants deeper into the north east quadrant of the site." The landscape plan depicted three adjoining "box" stores at the east end of the phase two area and smaller retail pads on the northern and eastern edges of the site. By visual comparison, the "box" stores each appear to be less than one-third the size of the proposed supercenter. There was no indication that these box stores would encompass a full grocery in addition to a big-box discount merchandise outlet, or that they would operate seven days a week, 24 hours a day.

A supercenter is a unique type of retail operation. "When the particular type of retail business planned for a proposed project will have unique or additional adverse impacts, then disclosure of the type of business is necessary in order to accurately recognize and analyze the environmental effects that will result from the proposed project. A rendering plant has different environmental impacts than a chandler. In the retail context, Supercenters are similarly unique. Unlike the vast majority of stores, many Supercenters operate 24 hours per day seven days a week. Such extended operational hours raise questions concerning increased or additional adverse impacts relating to lights, noise, traffic and crime." (*Bakersfield Citizens for Local Control, supra,* 124 Cal.App.4th at p. 1213.) There is also evidence in the record that supercenters draw from a larger regional market than more typical shopping centers with the same total square footage of retail space and thus may have unique traffic impacts.

## 3. *Change in Size of Retail Component*

The most significant change in the Project was the increase in the square footage of retail space in the phase two area. The 173,653-square-foot building represented a 6.5 percent increase in the size of the retail component of the phase two area, originally projected to be 163,000 square feet of retail space. The City's own zoning ordinance, by way of comparison, classifies a 5 percent increase in the square footage of an approved structure a major

modification of a project. (American Canyon Zoning Ord. [hereafter, Zoning Ordinance], § 19.45.020, subd. (B).)

The City's staff reports, the Developer's drawings, and Wal-Mart's letters clearly stated that the proposed supercenter would consist of a 173,653-square-foot building, a 12,676-square-foot outdoor garden center, and a 7,625-square-foot seasonal sales area, for a total of 193,954 square feet. The city council resolution approving the supercenter proposal acknowledged these physical dimensions. Nevertheless, the staff reported to the planning commission that the proposal resulted in a net *decrease* in the square footage of retail space in the Project as compared to the original master plan: "The subject project includes 154,074 square feet of commercial uses (*excluding the stockroom, employee use area and seasonal events sales area*), which when added to the 37,930 square feet of commercial uses currently planned for Phase I, is consistent with the 196,000 square feet evaluated by the [MND]." (Italics added.) The city attorney similarly informed the planning commission, "The total Project square footage including non Wal-Mart Napa Junction buildings would total 192,004 square feet, which is approximately 4,000 square feet less than the total square footage evaluated by the MND and *excludes approximately 32,255 square feet of stockroom and employee use area.*" (Italics added.) The city attorney concluded that the net decrease in retail square footage meant there was no substantial change in the Project requiring supplemental environmental review under section 21166. The planning commission adopted this analysis. The city council acknowledged the physical dimensions of the supercenter, but concluded there were no substantial changes in the Project that would require revisions to the MND. Appellant repeatedly objected to the City's square-footage analysis during the administrative proceedings.

The City provided no reasoned basis for excluding some areas of the proposed supercenter for purposes of evaluating changes in the size of the Project's retail component. On appeal, the City and Wal-Mart defend the City staff's square-footage analysis as consistent with a definition of "gross leasable area" in the City's general plan. The definition of "gross leasable area" appears in the economic development element of the general plan. Respondents provide no explanation why this definition is relevant to whether size changes in the Project were significant for purposes of environmental or other land use planning review.

Even assuming the definition is relevant, it does not support the City's analysis. The general plan defines gross leasable area as "the total gross floor area designed for tenants' occupancy and exclusive use. It is the area for

which tenants pay rent and the area [that] produces income." The storage and employee use areas of the supercenter building would be occupied by the tenant for the exclusive use of its agents and employees. The tenant would pay rent for those areas. Storage and employee use areas help to produce income because they provide a supply of merchandise to sell and of employees to do the selling.

The City's exclusion of storage and employee use square footage is arbitrary for an additional reason. In its initial evaluation of the Project, the City relied on the square footage of retail space indicated on the Project plans, without making adjustments for storerooms and employee use areas. By making adjustments in the square footage of the supercenter proposal and then comparing that adjusted square footage to the unadjusted square footage of retail space in the original Project, the City makes an inapt comparison. The City cites no evidence and makes no argument to justify using different methods of calculating the square footage of the supercenter and the other retail spaces. Absent such a foundation, the City's comparison is distorted and cannot support the conclusion that the square footage of the Project's retail component did not materially change.

■ Courts have acknowledged that an increase in the size of a development project can be a substantial change triggering subsequent environmental review. (*Concerned Citizens of Costa Mesa, Inc. v. 32d Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 937 [231 Cal.Rptr. 748, 727 P.2d 1029].) In *Fund for Environmental Defense, supra,* 204 Cal.App.3d 1538, the court rejected an argument that a size increase triggered subsequent environmental review, but the case is distinguishable. In that case, the agency acknowledged and evaluated the size increase; the increase in square footage was offset by an insignificant change in the project's footprint and a decrease in the height of the overall project; and the agency reasonably concluded the increase would not affect the project's traffic impacts or otherwise require revisions in the original EIR. (*Id.* at pp. 1545–1546.) Here, the City minimized the size increase; the increase in square footage was not offset by stability in the project's footprint or reductions in its height; and, as we will discuss further, there is no reasoned basis for the City's conclusion that the size increase would have no traffic impacts.

The City's conclusion that the supercenter proposal did not materially increase the size of the retail component of the Project is not supported by substantial evidence.

   C.  *The City's Determination That the Project Changes Would
       Not Have Significant Environmental Effects Requiring
       Supplemental Environmental Review Was an Abuse of
       Discretion*

   We conclude that the City did not accurately identify the supercenter
proposal's changes to the type and size of retail uses in the phase two area.
The City's determination that the supercenter proposal was not likely to
create environmental effects requiring supplemental environmental review is
therefore flawed. As to the traffic impacts of the supercenter proposal, the
City's determination was not supported by substantial evidence. As to the
urban decay effects of the supercenter proposal, the determination must be set
aside because the City failed to proceed as required by law by failing to
consider extraterritorial urban decay effects of the proposed supercenter.

       1.  *The City's Determination That the Supercenter Would
           Not Have Substantially Increased Traffic Impacts Is Not
           Supported by Substantial Evidence in the Record*

   The City's low calculation of the supercenter's square footage fatally
undermines its conclusion that the supercenter proposal would have no
significant effects on traffic requiring supplemental environmental review.[5]

   The MND Traffic Study for the original proposal assumed the Project
would include 196,000 square feet of retail development. Diagrams in the
traffic study depict phase two as consisting of several small retail pads. The
trip generation factor used in the study to project traffic impacts was based on
the "Retail (Shopping Center)" category in an industry trip generation
manual. According to the trip generation table in the study, the shopping
center category of use was predicted to generate 1.03 morning peak hour trips
and 3.74 evening peak hour trips per 1,000 square feet. At this rate, the retail
component of the Project was projected to generate 935 daily peak hour trips.
The Project as a whole (including the hotel, residences and retail areas) was
projected to generate 1,273 daily peak hour trips.

---

   [5] Wal-Mart argues that Appellant forfeited its traffic impacts argument because its opening
brief discussed only urban decay impacts. The issue was not forfeited. Appellant discussed
both the City's and its own traffic studies in its statement of facts, and it discussed traffic
impacts in the context of its argument that the City failed to meet its CEQA obligations.
Appellant clearly and persistently raised the issue of traffic impacts during the administrative
proceedings and in its writ petition. The trial court addressed traffic impacts in its decision.

Subsequently, in response to public comments about potential traffic impacts of a supercenter, the City had its expert prepare a revised trip generation analysis. The revised analysis used 154,074 as the square footage of the supercenter and applied the "Free-Standing Discount Store" trip generation factor, which was higher than the "Retail (Shopping Center)" trip generation factor used in the MND Traffic Study. For the remaining 37,930 square feet of retail space in the Project, the analysis applied a lower "Specialty Retail" trip generation factor. Using these factors, the supercenter was projected to generate 284 morning and 596 evening peak hour trips daily. The total retail component was projected to generate 312 and 699 morning and peak hour trips for a total of 1,011. After adjustments for captured and passer-by trips, which were required by the California Department of Transportation (Caltrans) and had not been used in the MND Traffic Study, the Project as a whole (including the hotel, residences and retail areas) was projected to generate 1,207 daily peak hour trips, as compared to 1,273 in the MND Traffic Study. The staff report stated, "This additional analysis shows an *overall reduction* in the number of peak hour trips [compared to the MND Traffic Study] . . . The potential traffic impacts of the overall Napa Junction project, assuming the implementation of required mitigation measures, would be unchanged."

Had the revised trip generation analysis used 173,653 square feet as the supercenter's square footage, the estimated peak hour trips generated by the supercenter would have been 320 in the morning and 672 in the evening. The estimated peak hour trips for the total retail component would have been 348 in the morning and 775 in the evening, for a total of 1,123. After adjustments, the total daily peak hour trips for the Project as a whole (including the hotel, residences and retail areas) would have been 1,303 rather than the 1,207 in the revised trip generation analysis. Compared to the 1,273 total daily peak hour trips projected in the original MND Traffic Study, the 1,303 figure represents a 30-trip increase.[6]

Nothing in the record explains the City's use of 154,074 for the square footage of the supercenter in the revised trip generation analysis. The analysis itself is a one-page document consisting of two tables and footnotes, none of which explains how the relevant square footage of the supercenter was

---

[6] Wal-Mart argued that the analysis by Appellant's expert, VRPA, demonstrated the Project would generate 8 percent *less* traffic than originally anticipated. Wal-Mart errs by comparing only the evening peak hour trips projected in the MND Traffic Study and in VRPA's projections based on 173,653 square feet and the freestanding discount store trip generation factor. As the City's own revised trip generation analysis shows, when the freestanding discount store factor is used, morning peak hour trips increase and evening peak hour trips decrease. A fair comparison requires consideration of all aspects of the trip generation analysis.

determined. The staff report to the city council makes the naked assertion that 154,074 square feet was used because the storeroom and employee space "will not generate vehicle trips." Appellant's traffic expert, on the other hand, opined that the proper square footage for the supercenter in the trip generation model used in the City's studies was 173,653. She defended that opinion by reference to the same manual the City's expert had used to obtain the trip generation factors.[7]

Based on Appellant's expert opinion, an increase of 30 peak hour trips could be a substantial change requiring supplemental environmental review. The expert opined, "Based upon our engineering judgment and practice elsewhere in the State, a 5 percent increase in traffic or 50 Peak Hour trips can cause the level of service (LOS) at studied intersections to degrade to the next LOS." Appellant's expert further observed that Caltrans requires traffic studies when a project generates one to 49 peak hour trips and the adjacent state route is operating at level of service E or F. Level of service is a measure of traffic congestion at intersections, which ranges from A (little or no delay) to F (extreme traffic delay). The level of service analysis in the MND Traffic Study indicates that the pre-Project level of service at intersections near the Project ranged from A to E. A 30-trip increase could have a significant effect on those intersections that were already operating at level of service E.

This case is readily distinguishable from cases where courts have upheld an agency's decision not to require supplemental environmental review under section 21166. The significant distinction is that the City based its section 21166 analysis on an inaccurate piece of information, that the supercenter was only 154,074 square feet in size. This inaccuracy resulted from the City's minimizing or underreporting the size of the structure in assessing the environmental effects of the project changes. In each of the cases cited, the court was able to identify specific, solid evidence in the record supporting the agencies' determinations that project changes would not have significant environmental effects requiring supplemental environmental review. (See *Bowman, supra*, 185 Cal.App.3d at pp. 1078–1080; *Fund for Environmental Defense, supra*, 204 Cal.App.3d at pp. 1545–1548; *Benton,*

---

[7] Appellant also produced expert evidence that supercenters generate traffic at a higher rate than freestanding discount stores. If true, this evidence would demonstrate that even the trip generation estimates discussed above (based on 173,653 and the freestanding discount store factor) underestimate the traffic that would be generated by the proposed supercenter. We do not analyze this evidence in detail because we conclude the City's conclusion that the supercenter would have no significant traffic effects is not supported by substantial evidence because of its use of an unreasonably low figure for the square footage of the supercenter. We note, however, that Appellant's evidence is consistent in principle with the City's own traffic studies, which projected different rates of trip generation per square foot for different types of retail uses.

*supra*, 226 Cal.App.3d at pp. 1473, 1483; *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 174–175 [43 Cal.Rptr.2d 501]; *Snarled Traffic Obstructs Progress v. City and County of San Francisco, supra*, 74 Cal.App.4th at pp. 800–802.)

The City's determination that the supercenter proposal would not have significant traffic effects requiring supplemental environmental review is not supported by substantial evidence.

> 2. *The City's Determination That the Supercenter Would Not Have Significant New Urban Decay Effects Must Be Set Aside Because the City Failed to Proceed as Required by Law*

Both Appellant and Citizen Appellants (collectively, Appellants) argue the City's determination that the supercenter proposal would not cause significant urban decay impacts requiring supplemental environmental review must be set aside because the City failed to proceed as required by law. Appellants fault the City for refusing to consider potential urban decay effects outside the City's boundaries.

"Economic and social changes resulting from a project shall not be treated as significant effects on the environment. Economic or social changes may be used, however, to determine that a physical change shall be regarded as a significant effect on the environment. Where a physical change is caused by economic or social effects of a project, the physical change may be regarded as a significant effect in the same manner as any other physical change resulting from the project. Alternatively, economic and social effects of a physical change may be used to determine that the physical change is a significant effect on the environment." (Guidelines, § 15064, subd. (e).)

Physical deterioration of a commercial area resulting from the economic competitive effects of a new development has long been recognized as an environmental effect subject to CEQA's requirements. (*Bakersfield Citizens for Local Control, supra*, 124 Cal.App.4th at pp. 1205–1207 [reviewing cases].) "It is apparent from the case law . . . that proposed new shopping centers do not trigger a conclusive presumption of urban decay. However, when there is evidence suggesting that the economic and social effects caused by the proposed shopping center ultimately could result in urban decay or deterioration, then the lead agency is obligated to assess this indirect impact. Many factors are relevant, including the size of the project, the type of retailers and their market areas and the proximity of other retail shopping opportunities. The lead agency cannot divest itself of its analytical and informational obligations by summarily dismissing the possibility of urban

decay or deterioration as a 'social or economic effect' of the project." (*Id.* at p. 1207.) *Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 931–934 [45 Cal.Rptr.3d 102] illustrates how the urban decay impacts of proposed Wal-Mart supercenters may be analyzed.

 The Supreme Court recently confirmed that an agency must identify and attempt to mitigate the extraterritorial environmental effects of any project it intends to carry out or approve. (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 359–360 [46 Cal.Rptr.3d 355, 138 P.3d 692].) "CEQA requires a public agency to mitigate or avoid its projects' significant effects not just on the agency's own property but '*on the environment*' (Pub. Resources Code, § 21002.1, subd. (b), italics added), with 'environment' defined for these purposes as 'the physical conditions which exist *within the area which will be affected by a proposed project*' (*id.*, § 21060.5, italics added)." (*City of Marina*, at p. 360.) In *City of Marina*, the court held that the board of trustees of the California State University had to mitigate the off-campus traffic effects of its campus expansion plans by contributing to a regional agency. (*Id.* at p. 367.)

On appeal, respondents rely in part on the city manager's fiscal impact study as substantial evidence that the proposed supercenter would not have urban decay effects requiring supplemental environmental review. That study did not purport to be an assessment of environmental effects, but instead offered a financial cost-benefit analysis of the proposal on the City's municipal coffers. The study was relevant to urban decay analysis because it considered whether the supercenter would cause other stores to close and store closures are triggers of urban decay, but it did not suffice as a full assessment because it expressly declined to consider any effects beyond the City's boundaries. The study stated that the store at greatest risk of closure due to competition from the supercenter was the Food-4-Less discount grocery store in Vallejo. "However, for the purposes of this study, the impacts are limited to the American Canyon community." Other evidence in the record strongly suggested the supercenter might have substantial extraterritorial effects. Appellant's expert predicted that the supercenter would cause both a Wal-Mart discount store and a Food-4-Less grocery store in Vallejo to close. Because those stores are co-anchors of a shopping center, the expert opined that their closure would likely lead to urban decay.[8]

---

[8] A report by the Bay Area Economic Forum, a partnership of the Association of Bay Area Governments and business, labor, university and community leaders, similarly warns that supercenters can threaten the economic vitality of neighborhood shopping centers and discusses several obstacles to the prompt releasing of abandoned buildings following store closures. Studies of the economic effects of Wal-Mart supercenters in other parts of the country also show a pattern of resulting store closures that can lead to urban decay.

Without citation to the administrative record, Wal-Mart argues that comments by the mayor and city council members provided substantial evidence in support of the City's determination that the supercenter would not have urban decay effects requiring supplemental environmental review. We have independently reviewed the transcripts of the city council meetings. Council members' only comments were that they had observed ample commercial development in the vicinity of supercenters; there was no reference to effects in neighboring jurisdictions. One council member said he understood that when stores close they are reoccupied quickly. He made the comment without any identified factual foundation and in the context of asking for more information on the subject. The mayor observed that the opening of a new grocery store in the City had not caused store closures within the City; she made no comment about the competitive effects of supercenters, extra-jurisdictional or otherwise. None of the council members responded to Appellant's expert's study of potential urban decay effects of the proposed supercenter, which was produced at the first council meeting before the council made a final decision on Appellant's appeal. The council members' anecdotal comments do not fill in the gap created by the City's failure to consider the extraterritorial environmental effects of the supercenter proposal.

### D. *Conclusion*

In sum, we conclude that the City violated section 21166. The City's determination that the supercenter proposal would not have significant new or substantially increased effects on the environment requiring supplemental environmental review is not supported by substantial evidence. On remand, the City must redetermine, based on an accurate identification of the project changes, whether subsequent environmental review of the project is required under section 21166.

Unlike the requirement for an initial study on initial environmental review, there is no fixed format for an agency's analysis under section 21166. (*Friends of Davis, supra*, 83 Cal.App.4th at p. 1018.) For this appeal, the City unsuccessfully attempted to piece together parts of the administrative record to justify its section 21166 determination. We note that in other section 21166 cases, agencies have used the format of an addendum to the initial environmental review document to substantiate the determination that no subsequent environmental review was required. (*Bowman, supra*, 185 Cal.App.3d at p. 1070; *Fund for Environmental Defense, supra*, 204 Cal.App.3d at p. 1543.) It may be in the City's interest to gather information into a similar single document in order to fairly evaluate and explain its section 21166 determination. Ultimately, the question for this court is simply whether the determination is supported by substantial evidence. On the record before us, it is not.

### E. *The Environmental Effects of Reasonably Foreseeable Future Development of the Reserved Areas of Phase Two*

In order to avoid an unnecessary round of further litigation, we address an additional problem with the City's section 21166 determination that appears from our review of the record. The supercenter proposal changed the original Project not only by adding the supercenter but by reserving two other areas of phase two for future development. In the original Project proposal, those reserved areas were part of the 163,000-square-foot shopping center and parking lot in phase two. If the reserved areas in the supercenter proposal are developed as retail uses, the increase in the size of the retail component of the Project will be even greater than the increase caused by the supercenter alone, as we have discussed. Future development of the reserved areas might also affect the reconfiguration of the parking lot and roadway in the phase two area. The record suggests that the City did not consider the environmental effects of the future development of these reserved areas when it determined whether supplemental environmental review was necessary under section 21166.

■ "[A]n EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights, supra,* 47 Cal.3d at p. 396.) "This standard is consistent with the principle that 'environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.' [Citation.] The standard also gives due deference to the fact that premature environmental analysis may be meaningless and financially wasteful." (*Ibid.*) On remand the City may need to consider the reasonably foreseeable future development of the reserved areas of phase two.

### III. *Zoning Ordinance Issues**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 1062.

DISPOSITION

We reverse and remand to the trial court with directions to issue a writ of mandate requiring the City to comply with Public Resources Code section 21166 and its own zoning code, consistent with the views expressed in this opinion, and to determine pursuant to section 21168.9 whether to stay construction and retail activities until full compliance with CEQA has occurred. Appellants are awarded their costs.

Jones, P. J., and Bruiniers, J.,* concurred.

---

*Judge of the Superior Court of Contra Costa County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.